**In the United States District Court
for the District of Kansas**

───────────

Case No. 6:20-cv-01342-TC

───────────

JOSEPH LANZRATH,

*Plaintiff*

v.

PIPING TECHNOLOGY CO.,

*Defendant*

───────────

**MEMORANDUM AND ORDER**

Joseph Lanzrath filed this action against his former employer, Piping Technology Co. (PTC), alleging that it discriminated against him based on his age and disability. Doc. 29 at ¶ 4.a.i–ii. PTC moved for summary judgment on both claims. Doc. 33. For the following reasons, PTC's motion for summary judgment is granted in part and denied in part.

**I**

**A**

Summary judgment is proper under the Federal Rules of Civil Procedure when the moving party demonstrates "that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A fact is "material" when it is essential to the claim's resolution. *Adler v. Wal-Mart Stores, Inc.*, 144 F.3d 664, 670 (10th Cir. 1998). And disputes over those material facts are "genuine" if the competing evidence would permit a reasonable jury to decide the issue in either party's favor. *Id.* Disputes—even hotly contested ones—over facts that are not essential to the claims are irrelevant. Indeed, belaboring such disputes undermines the efficiency Rule 56 seeks to promote.

At the summary judgment stage, material facts "must be identified by reference to affidavits, deposition transcripts, or specific exhibits incorporated therein." *Adler*, 144 F.3d at 671; *see also* D. Kan. R. 56.1(d). To determine whether a genuine issue of fact exists, the Court views all evidence, and draws all reasonable inferences, in the light most favorable to the nonmoving party. *Carter v. Pathfinder Energy Servs., Inc.*, 662 F.3d 1134, 1138 (10th Cir. 2011); *see also Allen v. Muskogee,* 119 F.3d 837, 839–40 (10th Cir. 1997). That said, the nonmoving party cannot create a genuine factual dispute by making allegations that are purely conclusory, *Adler*, 144 F.3d at 671–72, 674, or unsupported by the record as a whole, *see Scott v. Harris*, 550 U.S. 372, 378–81 (2007).

The moving party bears the initial burden of showing the absence of any genuine issue of material fact and entitlement to judgment as a matter of law. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986); *Hicks v. City of Watonga*, 942 F.2d 737, 743 (10th Cir. 1991). Once the moving party meets its burden, the burden shifts to the nonmoving party to demonstrate that genuine issues remain for trial as to those dispositive matters. *Applied Genetics Int'l, Inc. v. First Affiliated Sec., Inc.*, 912 F.2d 1238, 1241 (10th Cir. 1990); *see Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586–87 (1986); *Bacchus Indus., Inc. v. Arvin Indus., Inc.*, 939 F.2d 887, 891 (10th Cir. 1991).

**B**

**1.** PTC is a subcontractor for ONEOK, Inc., an oil, gas, and pipeline company with facilities in Kansas. Doc. 29 at ¶ 3.b. Under a contract with ONEOK, PTC employees work at ONEOK's railcar and truck station at the storage facility in Conway, Kansas. *Id.* at ¶¶ 2.a.2, 3.b.

The work is demanding. Employees at the railcar or truck stations must carry, lift, and pull heavy hoses, all while working outside in the elements. Doc. 34 at ¶ 8; Doc. 36 at ¶ 8. When PTC employees are not loading or unloading materials, they are expected to carry out other assignments as directed by ONEOK operators and staff. Doc. 34 at ¶ 12; Doc. 36 at ¶ 12. Specifically at the Conway facility, teams of three to four employees—consisting of one or two ONEOK employees and one or two PTC employees—worked shifts together. Doc. 34 at ¶ 11; Doc. 36 at ¶ 11 (controverted on irrelevant grounds). Shifts operated on a twelve-hour basis, seven days on, seven days off. Doc. 34 at ¶ 10; Doc. 36 at ¶ 10.

PTC hired Lanzrath on June 10, 2019, for a railcar position (also known as rail rack) at the Conway facility. Doc. 34 at ¶ 14; Doc. 36 at ¶ 14. At that time, Lanzrath was 52 years old, Doc. 34 at ¶ 15; Doc. 36 at ¶ 15, and was the oldest employee in all four units, Doc. 29 at ¶ 3.a. Lanzrath joined the day shift from 3:30 a.m. to 3:30 p.m., loading and unloading tank cars when they arrived. He worked without incident until October 31, 2019, when he informed PTC of a shoulder injury that he suffered outside of work. Doc. 34 at ¶ 17; Doc. 36 at ¶ 17 (controverted on irrelevant grounds). Lanzrath notified PTC that he would miss work but did not specify how long his absence would be. Doc. 34 at ¶ 17.

Lanzrath was not gone long. He returned to work in the latter half of November after missing just one seven-day shift. Doc. 34 at ¶ 18; Doc. 36 at ¶¶ 17–18; Doc. 39 at ¶¶ 17–18. At some point after December 2, 2019, Lanzrath received an epidural shot for his shoulder and, from that point, had no further issues. Doc. 34 at ¶ 25; Doc. 36 at ¶ 25. Lanzrath got a note from his physician in late December 2019 that allowed him to work without restrictions beginning January 8, 2020. Doc. 34 at ¶ 21; Doc. 36 at ¶ 21. Returning to his next shift after January 8, Lanzrath resumed his same position and responsibilities. Doc. 34 at ¶¶ 22, 23; Doc. 36 at ¶¶ 22, 23 (controverted on irrelevant grounds).

Shortly after Lanzrath's return to full duties, ONEOK asked PTC to provide an employee for a maintenance helper position. Doc. 34 at ¶ 28; Doc. 36 at ¶ 28. Lanzrath applied because he considered it a better job and because, he alleges, a ONEOK employee and maintenance supervisor, Travis Mosier, recommended and offered him the position. Doc. 36 at ¶ 30; Doc. 36-2 at 12. (Mosier denies that he recommended or offered the position to Lanzrath. Doc. 39 at ¶ 30.) Ultimately, PTC's operating supervisor, Ed Bate, called Lanzrath to inform him that PTC was hiring a different candidate. *Compare* Doc. 34 at ¶ 31, *with* Doc. 36 at ¶ 30. According to Lanzrath, Bate added that it was "a young man's game." Doc. 34-5 at 85.

There is a dispute as to who actually made the decision not to hire Lanzrath for the maintenance helper position. PTC argues that "ONEOK, through Mosier, made the final determination on who to hire to fill the maintenance helper position." Doc. 34 at ¶ 31. And, according to PTC, Mosier told PTC that he did not want Lanzrath to be hired for that position and instructed PTC to hire a different candidate. *Id.* at ¶ 32. But Lanzrath disputes that contention, testifying that

3

Mosier offered him the position, which he had accepted. Doc. 36-2 at 11–12. But prior to that start date, Lanzrath alleges that Bate told him that PTC would instead be hiring the son of one of Bate's friends because it was a young man's game and Lanzrath was not a young man. *Id.* at 13. As the nonmoving party, Lanzrath's version of the events is credited. *Sprint Nextel Corp. v. Middle Man, Inc.*, 822 F.3d 524, 530 (10th Cir. 2016).

In addition to the "young man's game" remark, Lanzrath alleges other instances of age-related comments. For example, he claims that Bate told him he was too old to run a weed eater and that people Lanzrath's age do not heal from injury. Doc. 36 at 8, ¶ 14. Bate expressed concern about the liability associated with Lanzrath. Doc 36-4 at 3. Lanzrath also alleges that other PTC employees made age-related comments on a daily basis. *Id.* at 7, ¶¶ 6, 9. Lanzrath testified that when he presented a doctor's letter to Christy Weis, the PTC HR Supervisor, she told him, "We don't have light duty. Because of your age you're a liability." Doc. 36-2 at 29.[1]

Then, like it did for much of the country, the COVID-19 pandemic upended Lanzrath's job at PTC. In March 2020, ONEOK informed PTC that it would have to reduce its labor force at the Conway facility for the railcar and truck station by one person per shift. Doc. 34 at ¶ 35; Doc. 36 at ¶ 35. PTC laid off Lanzrath and three other employees on March 16, 2020. Doc. 34 at ¶ 37; Doc. 36 at ¶ 37. Lanzrath contends that Bate called him that day and told him that he was being laid off. Doc. 34 at ¶¶ 38–39; Doc. 36 at ¶¶ 38–39 (PTC disputes that characterization). The day Lanzrath was terminated, PTC hired a man aged 40 for the rail rack position. Doc. 36 at ¶ 43. Over the course of several weeks, PTC laid off 86 other employees due to the pandemic. Doc. 34 at ¶ 42; Doc. 36 at ¶ 42; Doc. 36-3 at 3–5. Over the next few months, PTC gradually hired back employees. Doc. 36-3 at 3–6. The numbers suggest that both older and younger employees were terminated and a mix were hired back. *See* Doc. 36-3. PTC did not hire Lanzrath back but hired a new employee, identified as MO, into the rail rack position

---

[1] In addition to the comments from Bate and Weis, Lanzrath claims that two others (former PTC employee Mandy Smith and Weis's son-in-law) told him that PTC managers were concerned about Lanzrath's age. Doc. 36-2 at 18, 29. PTC objects on the basis of hearsay. Doc. 39 at 19, ¶ 9.

a month after Lanzrath's termination. Doc. 36 at 10, ¶ 22. MO was age 20 at the time of hire. *Id.*

**2.** Lanzrath asserts that PTC made two adverse employment decisions in violation of federal law. Doc. 29 at ¶ 4.a. Invoking the Age Discrimination in Employment Act (ADEA), 29 U.S.C. § 623, he alleges that PTC refused to hire him for the position of maintenance helper in January 2020 and then terminated him in March 2020 because of his age. *Id.* at ¶ 4.a.i. Lanzrath also contends that his termination was because PTC perceived him to be disabled, a violation of the Americans with Disabilities Act, as amended (ADA), 42 U.S.C. § 12101, *et seq.* Doc. 29 at ¶ 4.a.ii. PTC moved for summary judgment on both claims. Doc. 33.

## II

PTC's motion for summary judgment is granted in part and denied in part. Lanzrath has raised genuine disputes of material fact as to his ADEA claims. But PTC is entitled to judgment as a matter of law as on the ADA claims.

### A

Lanzrath contends that he was discriminated against on the basis of his age in violation of the ADEA. Doc. 29 at ¶ 4.a.i. He contends that PTC declined to hire him as the maintenance helper position and ultimately selected him for termination in March 2020. Doc. 29, ¶¶ 3.a. & 4.a.

On the age-discrimination claims, PTC argues that Lanzrath has no evidence that his age was a consideration in its employment decisions, Doc. 34 at 16–17, and that it had legitimate, nondiscriminatory business reasons to not select Lanzrath for the maintenance helper position and to terminate him in March 2020. Doc. 34 at 20–21. Because Lanzrath has created a genuine dispute of material fact, PTC's motion is denied.

**1.** Plaintiffs may prove age discrimination may prove by either direct or circumstantial evidence. *See Stone v. Autoliv ASP, Inc.*, 210 F.3d 1132, 1136 (10th Cir. 2000). When there is sufficient direct evidence of discriminatory intent, nothing more is required to entitle a plaintiff to present the claim to a jury. *See Ramsey v. City & Cnty. of Denver*, 907 F.2d 1004, 1007 (10th Cir. 1990). "Direct evidence is evidence, which

if believed, proves the existence of a fact in issue without inference or presumption." *Riggs v. AirTran Airways, Inc.*, 497 F.3d 1108, 1117 (10th Cir. 2007). Discriminatory policies by the company can constitute direct evidence, *Tomsic v. State Farm Mut. Auto. Ins. Co.*, 85 F.3d 1472, 1477 (10th Cir. 1996), as can "oral or written statements on the part of a defendant showing a discriminatory motivation," *Kendrick v. Penske Transp. Servs., Inc.*, 220 F.3d 1220, 1225 (10th Cir. 2000). But statements that can plausibly be interpreted in two different ways—"one discriminatory and the other benign"—are not direct evidence. *Hall v. U.S. Dep't of Labor*, 476 F.3d 847, 855 (10th Cir. 2007) (quoting *Patten v. Wal-Mart Stores E., Inc.*, 300 F.3d 21, 25 (1st Cir. 2002)).

Even without direct evidence of discriminatory intent, circumstantial evidence can allow a claim to survive summary judgment. In those circumstances, the Tenth Circuit applies the *McDonnell Douglas* framework. *Jones v. Okla. City Pub. Sch.*, 617 F.3d 1273, 1279 (10th Cir. 2010); *see also Sanders v. Sw. Bell Tel., L.P.*, 544 F.3d 1101, 1105 (10th Cir. 2008) (referring to *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973)). Under that analysis, a plaintiff "bears the initial burden of setting forth a prima facie case of discrimination." *Sanchez v. Denver Pub. Sch.*, 164 F.3d 527, 531 (10th Cir. 1998). If satisfied, the burden then shifts to the employer to give a legitimate, nondiscriminatory reason for its employment decision. *See Morgan v. Hilti, Inc.*, 108 F.3d 1319, 1323 (10th Cir. 1997). And then, if satisfied, "the burden then reverts to the plaintiff to show that there is a genuine dispute of material fact as to whether the employer's proffered reason for the challenged action is pretextual—i.e., unworthy of belief." *Id.* (quotation marks omitted). Only when a plaintiff demonstrates pretext does he or she get "over the hurdle of summary judgment." *Id.*

**2.** Accepting Lanzrath's testimony as true, a jury may find that PTC's decision not to hire him was "because of [his] age," 29 U.S.C. § 623(a). This is true regardless of whether the evidence is viewed as direct or circumstantial proof of discriminatory intent.

**a.** Bate's statement that he was not hiring Lanzrath because it was a "young man's game" is direct evidence of discrimination. As a matter of syntax and temporal proximity, it is hard to plausibly interpret it in any way other than as an express acknowledgement that Lanzrath's age was a primary reason that PTC did not hire him for its maintenance helper position. *Tabor v. Hilti, Inc.*, 703 F.3d 1206, 1217 (10th Cir. 2013) (holding as direct evidence "statements by a decisionmaker during an interview expressing discriminatory beliefs about whether members of

6

the plaintiff's protected class are capable of doing the job at issue"); *see also Van Voorhis v. Hillsborough Cnty.*, 512 F.3d 1296, 1299 (6th Cir. 2004) (finding direct evidence where pilot was rejected for a job after hiring manager allegedly said he "didn't want to hire any old pilots"). Context also supports this conclusion: the statement was made to Lanzrath during the call in which Bate communicated his hiring decision and served as the explanation or rationale for that choice. *See McCowan v. All Star Maint. Inc.*, 273 F.3d 917, 922 n.3 (10th Cir. 2001) ("When a plaintiff alleges that discriminatory comments constitute direct evidence of discrimination, . . . the plaintiff must demonstrate a nexus exists between the allegedly discriminatory statements and the decision to terminate her."). Thus, Lanzrath's claim for failure to hire as to the maintenance helper position survives summary judgment. *See Sanders*, 544 F.3d at 1105 (finding direct evidence where plaintiff identified a statement that she was being laid off due to her age at the time of her termination).

PTC's arguments that Lanzrath lacks direct evidence of discrimination are unavailing at this stage. *Contra* Doc. 34 at 16. PTC's argument depends on crediting its view of the disputed events and ignoring Lanzrath's version. In particular, PTC relies on the allegation that Mosier did not want Lanzrath to get the position, that ONEOK (through Mosier) selected someone else, and that Bate actually wanted Lanzrath to get the position. Doc. 34 at 18–19. That evidence may be offered at trial, and a jury may accept it. But for the purposes of summary judgment, all disputed facts are viewed in the light most favorable to Lanzrath. *See Sprint Nextel Corp. v. Middle Man, Inc.*, 822 F.3d 524, 530 (10th Cir. 2016).

**b.** Even if Bate's statement was capable of being interpreted in a benign way, Lanzrath has offered sufficient circumstantial evidence to present his case to the jury. A plaintiff seeking to establish the prima facie elements of an ADEA claim need only show that he or she is a member of the class protected by the ADEA, applied for and was qualified for the position but despite the qualification was rejected, and after being rejected, the position was filled by someone outside the protected class. *MacKenzie v. City & Cnty. of Denver*, 414 F.3d 1266, 1277–78 (10th Cir. 2005), *abrogated in irrelevant part by Lincoln v. BNSF Ry. Co.*, 900 F.3d 1166 (10th Cir. 2018). The burden is light. *See Adamson*, 514 F.3d at 1146.

PTC acknowledges that Lanzrath meets the first two elements of a prima facie case, agreeing that he is of a protected age and that he

was qualified for the position he held.² But it argues that Lanzrath has not made a prima facie case because "he cannot prove that the adverse employment action was related to his age." Doc. 34 at 17. In support, PTC first argues that the Supreme Court in *Gross v. FBL Fin. Servs.*, 557 U.S. 167, 177 (2009), recognized that plaintiffs in an ADEA case must produce evidence of "but for" causation, which Lanzrath cannot satisfy. Second, it notes that "Bate is the same age as Lanzrath," which "weakens Lanzrath's theory that PTC, specifically Bate, was motivated by age in any decisions it made regarding Lanzrath's employment." *Id.* at 17–18. And third, it argues that ONEOK made the ultimate decision not to hire Lanzrath. *Id.* at 18–19.

These arguments fail. To present a prima facie case, Lanzrath need not affirmatively prove but-for causation or account for Bate's own membership in the protected class. Instead, he must simply produce evidence that he was rejected for the promotion and that the position was instead "filled by someone outside the protected class." *MacKenzie*, 414 F.3d at 1278; *see also Greene v. Safeway Stores, Inc.*, 98 F.3d 554, 558 (10th Cir. 1996) (discussing, in ADEA termination context, the Supreme Court's rejection of test requiring replacement by someone outside the protected age group rather than merely by a relatively younger plaintiff). There is no dispute that Lanzrath was rejected for the promotion. And PTC does not argue that the man selected was a member of Lanzrath's same age group.³ That leaves only the question of who made the decision not to promote Lanzrath—ONEOK or PTC. Both parties have presented competent evidence bringing that fact into genuine dispute. *See supra* Part I.B.1.; *Sanders*, 544 F.3d at 1105–06. Thus, Lanzrath has stated a prima facie case.

It is, then, PTC's burden to show some legitimate, nondiscriminatory reason for its decision not to promote Lanzrath. *See Jones*, 617 F.3d

---

² PTC is silent on Lanzrath's qualifications for the maintenance helper position to which he applied. Because it has not argued that Lanzrath was not qualified, this Memorandum and Order will assume that he was.

³ Neither party provides the age of the man hired instead of Lanzrath. Lanzrath identifies him only as the "son" of Bate's friend. Doc. 36 at ¶ 30. There is some question as to whether that information suffices to draw a reasonable inference in Lanzrath's favor, but because PTC has not argued that Lanzrath cannot satisfy this element, the issue will not be decided now.

at 1278. This it does by raising a genuine dispute about whether it actually exercised any decision-making power or whether it merely implemented, without knowledge of any discriminatory intent, ONEOK's promotion decision. *See* Doc. 34 at 18–21.

Having offered a legitimate, nondiscriminatory reason for his termination, PTC's burden shifts back to Lanzrath to offer evidence that "create[s] a genuine factual dispute regarding the veracity of a defendant's nondiscriminatory reason." *Jones*, 617 F.3d at 1280 (quoting *Bryant*, 432 F.3d at 1125). Evidence of pretext is sufficient when it shows "such weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions" in the employer's reasons that "a reasonable factfinder could rationally find them unworthy of credence and hence infer that the employer did not act for the asserted non-discriminatory reasons." *Id.* (quoting *Jaramillo v. Colo. Judicial Dep't*, 427 F.3d 1303, 1308 (10th Cir. 2005)). Importantly, courts do not "second guess the business judgment of the employer." *DePaula v. Easter Seals El Mirador*, 859 F.3d 957, 970 (10th Cir. 2017) (internal quotation marks omitted). Thus, a plaintiff must produce evidence that the employer did more than "get it wrong." *Johnson v. Weld Cnty., Colo.*, 594 F.3d 1202, 1211 (10th Cir. 2010). The evidence must indicate that the employer "didn't really believe its proffered reasons for action and thus may have been pursuing a hidden discriminatory agenda." *Id.*

Lanzrath has carried this burden, even under the but-for causation standard announced in *Gross*. The Tenth Circuit has consistently held that an ADEA plaintiff may succeed where there is proof that age was the factor that made the difference in the adverse employment decision. *Jones*, 617 F.3d at 1277–78 (rejecting the argument that *Gross* embodied a heightened requirement). Even after *Gross*, the summary judgment question remains whether the plaintiff offered evidence that, if believed by a jury, suggests the employer's professed reason is unworthy of belief. *Id.* at 1278–79. And Lanzrath's evidence—which includes derogatory statements about his age from PTC management and conflicting stories from PTC and ONEOK employees about how the maintenance helper position was filled—is sufficient to create a genuine factual dispute about the veracity of PTC's reasons not to promote him. *Cf. Foster v. Mt. Coal Co., LLC*, 830 F.3d 1178, 1194 (10th Cir. 2016) (observing reasonable jurors could find pretext due to "inconsistent reasons for terminat[ion]," where two employees testified that the fired employee had "lied about providing" a certain form, while

another testified that the problem with the form was it "didn't have the right date . . . and stuff on it").

**3.** Lanzrath's March 2020 termination is different, in that he does not argue that there is any direct evidence of age discrimination. Doc. 36 at 15–16.[4] Instead, he alleges that PTC employees' various age-related comments, when taken together with his March 2020 layoff, the nature of that termination, and his ultimate replacement with a younger employee, constitute circumstantial evidence pointing to age discrimination. *Id.* at 17–18.

Without direct evidence, Lanzrath's termination claim proceeds under the *McDonnell Douglas* framework. *See Sanders*, 544 F.3d at 1105. To establish a prima facie case of age discrimination in the reduction-in-force context, a plaintiff must provide evidence that he or she is a member of the ADEA's protected class, was doing satisfactory work, was discharged despite the adequacy of his work, and there is some evidence that the employer intended to discriminate when making its decision. *Beaird v. Seagate Tech, Inc.*, 145 F.3d 1159, 1165 (10th Cir. 1998); *contra* Doc. 34 at 17 (citing *Gross*, 557 U.S. at 177). To satisfy the final element, a plaintiff may show that he or she was treated less favorably than younger employees. *Beard*, 145 F.3d at 1165.

Viewing the evidence in the light most favorable Lanzrath, he has carried his prima facie burden. The record indicates that on the same day Lanzrath was terminated, an employee identified as RZ was hired for rail rack—the same role Lanzrath held. Doc. 36 at ¶ 43. Lanzrath alleges that this employee was about 40 or 41 years old at the time. *Id.* While that also puts RZ in the protected group (over 40), plaintiffs need merely show that they were replaced by someone younger, as a relative matter. *See Greene*, 98 F.3d at 558 (citing *O'Connor v. Consolidated Coin Caterers Corp.*, 517 U.S. 308 (1996)). "Evidence that an employer fired qualified older employees but retained younger ones in similar

---

[4] Unlike with the failure-to-promote claim, Bate's comment was separated in time and contextually unrelated to the emergent and historic shutdowns that the COVID-19 pandemic caused. *See generally Goodwill Indus. of Cent. Okla., Inc. v. Phila. Indem. Ins. Co.*, 21 F.4th 704 (10th Cir. 2021) (discussing the interruption to business caused by COVID-19 and the resultant public health policies); *see also Hall*, 476 F.3d at 855 (rejecting a direct evidence claim where the identified testimony provided "no explicit nexus" between the protected activity and the adverse employment decision).

positions is sufficient to create a rebuttable presumption of discriminatory intent . . . ." *Branson v. Price River Coal Co.*, 853 F.2d 768, 771 (10th Cir. 1988). Lanzrath has therefore identified sufficient evidence to state a prima facie case. *See, e.g.*, *Beaird*, 145 F.3d at 1167.

PTC must therefore articulate a legitimate, nondiscriminatory reason for the March 2020 termination. *Jones*, 617 F.3d at 1278. It has done so based on the COVID-19 pandemic. Doc. 34 at ¶¶ 37, 42. At the time of the layoff, the pandemic caused a massive disruption to employers around the nation—and the world. *See Goodwill*, 21 F.4th at 708; *see also* Liz Hoffman & Marcelo Prince, Wall Street Journal, *The Month Coronavirus Felled American Business* (Apr. 4, 2020) (available at: https://www.wsj.com/graphics/march-changed-everything/) (last accessed March 2, 2022). In fact, PTC laid off Lanzrath and over 80 other employees as a result. Doc. 34 at ¶ 42; Doc. 36 at ¶ 42. As PTC argues, the decision to layoff so many employees during the early stages of the pandemic strongly suggests that age was not a factor in the decision to terminate Lanzrath. That view is supported by the fact that many of these other employees were younger (some by decades) than Lanzrath. Doc. 36-3 at 3. The day Lanzrath was terminated, six other employees were let go: four of those six were in their early- to mid-twenties. *Id.* Through April 1, 2020, of the 62 employees terminated, 37 were under age 40—and therefore not in the protected class. *Id.* at 3–4. This is a legitimate and nondiscriminatory reason for the March layoffs. *See generally Garcia v. Pueblo Country Club*, 299 F.3d 1233, 1238 (10th Cir. 2002) (quoting *Graefenhain v. Pabst Brewing Co.*, 827 F.3d 13, 20 (7th Cir. 1987)); *see also James v. N.Y. Racing Ass'n*, 233 F.3d 149 (2d Cir. 2000) (affirming summary judgment for employer in RIF context despite ageist comments because the reduction was necessary to avoid bankruptcy)).

But that is not the end of the inquiry. Having established a nondiscriminatory reason for the termination, PTC's burden then shifts back to Lanzrath to demonstrate that "a discriminatory reason more likely motivated the employer or that the employer's proffered explanation is unworthy of credence." *Jencks v. Modern Woodmen of Am.*, 479 F.3d 1261, 1267 (10th Cir. 2007). Accepting Lanzrath's version of the events, he meets that burden.

Lanzrath provides sufficient evidence that PTC's reason for his termination was pretextual. The inquiry for determining pretext is "whether the employer's stated reasons were held in good faith at the time of the discharge, even if they later prove to be untrue, or whether

11

plaintiff can show that the employer's explanation was so weak, implausible, inconsistent or incoherent that a reasonable fact finder could conclude that it was not an honestly held belief but rather was subterfuge for discrimination." *Young v. Dillon Cos., Inc.*, 468 F.3d 1243, 1250 (10th Cir. 2006).

Courts reviewing for pretext must examine the facts as they would have appeared to the person making the decision to terminate the plaintiff. *See Dewitt v. Sw. Bell Tel. Co.*, 845 F.3d 1299, 1307 (10th Cir. 2017). At bottom, an employee can raise an inference of pretext against an argument of business judgment by showing that the employer did not honestly believe the reasons given, the employer did not act in good faith on those beliefs, or the business reason is so idiosyncratic or questionable that a factfinder could reasonably find that it is a pretext for illegal discrimination. *Beaird*, 145 F.3d at 1169.

As discussed above, the business judgment doctrine limits the scope of judicial inquiry. Federal courts are not permitted to "ask whether the employer's reasons were wise, fair or correct; the relevant inquiry is whether the employer honestly believed its reasons and acted in good faith upon them." *Riggs*, 497 F.3d at 1118–19. The reason is plain: "Our role is to prevent intentional discriminatory hiring practices, not to act as a 'super personnel department,' second guessing employers' honestly held (even if erroneous) business judgments." *Id.* at 1119 (quoting *Young*, 468 F.3d at 1250).

Yet not all judgments are immunized by that doctrine. For example, illegal discrimination is never excused. *See, e.g., Beaird*, 145 F.3d at 1169. Where an RIF is at play, a plaintiff will usually establish pretext by showing that his or her termination does not accord with the RIF criteria employed, the RIF criteria were deliberately falsified or manipulated to secure his or her termination, or the RIF was more generally pretextual. *See Beaird*, 145 F.3d at 1168. A plaintiff can establish pretext by accumulating pieces of circumstantial evidence that on their own may be insufficient but when combined are indicia of pretext. *Id.* at 1174.

Lanzrath identifies several facts that he contends would permit a jury to find pretext. Doc. 36 at 17–18. Some of them, especially when viewed in isolation, are innocuous and might fall within the core meaning of business judgment, including PTC's transfer of another employee to a different shift shortly before the layoff and the separation of three employees before the March 2020 COVID-19 layoff (which

Lanzrath argues made his own termination unnecessary because they no longer had too many people on his team). *See id.* The same can be said about PTC's hiring a new employee a month later instead of bringing Lanzrath back. *Cf. Pippin v. Burlington Res. Oil & Gas Co.*, 440 F.3d 1186, 1194 (10th Cir. 2006) (rejecting plaintiff's theory that new hires after a RIF are per-se pretextual). These are common types of business decisions and, without more than Lanzrath's self-interested "opinions of how a business should be run," would not rise to the level of pretext. *Id.*

But Lanzrath's other facts, especially when viewed collectively, raise an inference of pretext. For example, he alleges several age-related comments, including from Weis and Bate, about their concern for how Lanzrath's age would hamper his ability to heal from his shoulder injury. Doc. 36 at 17. Weis made her comment in December 2019, *see id.* at 7, ¶ 6, and Bate's came roughly two months before Lanzrath's March 2020 termination, *id.* at 8, ¶ 13. That temporal proximity arguably gives rise to an inference of pretext. *Compare Metzler v. Fed. Home Loan Bank of Topeka*, 464 F.3d 1164, 1171–72 (10th Cir. 2006), *and Ramirez v. Okla. Dep't of Mental Health*, 41 F.3d 584, 596 (10th Cir. 1994) (where one and a one-half month period may establish temporal proximity) (overruled on other grounds by *Ellis v. Univ. of Kan. Med. Ctr.*, 163 F.3d 1186 (10th Cir. 1998)), *with Richmond v. ONEOK, Inc.*, 120 F.3d 205, 209 (10th Cir. 1997) (holding a three-month period in retaliation case was insufficient to establish a causal connection). Temporal proximity, standing alone, is not sufficient to establish pretext, *Annett v. Univ. of Kans.*, 371 F.3d 1233, 1240 (10th Cir. 2004), but it is something to consider along with other factors, *Beaird*, 145 F.3d at 1174.

There is more. For example, PTC hired RZ, a younger employee, the very day that Lanzrath was terminated. Doc. 36 at 18. If an employee is selected for a RIF "solely on the basis of position elimination," then qualifications become irrelevant. *See, e.g., Pippin*, 440 F.3d at 1194 (quoting *Furr v. Seagate Tech., Inc.*, 82 F.3d 980, 988 (10th Cir. 1996)). But one way employees can show pretext is to present evidence that the job was not in fact eliminated. *Id.* Lanzrath has produced evidence indicating that PTC hired RZ, a younger employee to do the same job Lanzrath did, for Lanzrath's shift the very same day it told

13

Lanzrath he was being laid off.[5] Doc. 36 at 17. This gives rise to the inference that the pandemic was not the reason for Lanzrath's termination.

In addition, Lanzrath heard inconsistent stories about his separation. Bate told him that he was being "laid off" due to COVID-19, but Weis told him the next day that he was being terminated. *See* Doc. 36-2 at 5–6. Maybe those were consistent statements with imprecise language, indicative of nothing. Or maybe not. That is for a jury to decide. *See Whittington v. Nordam Grp. Inc.*, 429 F.3d 986, 994 (10th Cir. 2005) (finding indication of pretext where employer offers inconsistent reasons for termination); *see also Tomsic*, 85 F.3d at 1479 (same); *Dominguez-Cruz v. Suttle Caribe, Inc.*, 202 F.3d 424, 432 (1st Cir. 2000) (holding employers may have various rationales to dismiss an employee, but when they "at different times, gives different explanations, a jury may infer that the articulated reasons are pretextual").

Considered separately and without regard to the bigger picture, Lanzrath's evidence might not indicate pretext. But courts are "required to consider the totality of such circumstantial evidence." *Beaird*, 145 F.3d at 1174. And when taken together, his evidence may (or may not) cause a reasonable jury to question PTC's explanation. It is not a court's role at summary judgment to determine PTC's "true state of mind." *Randle v. City of Aurora*, 69 F.3d 441, 453 (10th Cir. 1995). Lanzrath is entitled to have a jury resolve that issue.

**B**

Lanzrath also alleges that PTC did not select him for the maintenance helper position, and later terminated him, because of a perceived disability, in violation of the ADA. Doc. 29 at ¶ 4.a.ii; *see* 42 U.S.C. § 12102(1)(c). Specifically, Lanzrath points to his shoulder injury,

---

[5] PTC disagrees that RZ was hired that day, Doc. 39 at 21–22, ¶ 15, but in support it relies only on deposition testimony that Morris "d[id] not know his start date" and that he "believe[d] he was already a PTC employee [when Lanzrath was discharged] but I'm not sure," Doc. 39-5 at 6. At most, this creates a genuine dispute of fact that, for purposes of summary judgment, is viewed in favor of Lanzrath.

claiming it caused PTC to regard him as having a disability.[6] Doc. 36 at 19.

The ADA defines the term "disability" to "mean[], with respect to an individual—(A) a physical or mental impairment that substantially limits one or more major life activities of such individual; (B) a record of such an impairment; or (C) being regarded as having such an impairment." 42 U.S.C. § 12102(1). Under the regarded-as prong, that impairment "need not limit or even be perceived as limiting a major life activity—the employer need only regard the employee as being impaired, whether or not the employer also believed that the impairment prevented the employee from being able to perform a major life activity." *Adair v. City of Muskogee*, 823 F.3d 1297, 1305–06 (10th Cir. 2016). For an impairment to qualify for a regarded-as claim, it cannot be "transitory and minor." 42 U.S.C. § 12102(3); *see also Adair*, 823 F.3d at 1306.

The parties have pointed to no law defining what constitutes a "transitory and minor" injury. *See* Doc. 34 at 10–12; Doc. 36 at 20. While the ADA itself defines "transitory" as those impairments with an actual or expected duration of six months or less, 42 U.S.C. § 12102(3)(b), the term "minor" is not statutorily defined, *see Eshleman v. Patrick Indus., Inc.*, 961 F.3d 242, 246 (3d Cir. 2020); *Silk v. Bd. of Trs., Moraine Valley Cmty. Coll., Dist. No. 524*, 795 F.3d 698, 706 (7th Cir. 2015); *Summers v. Altarum Inst., Corp.*, 740 F.3d 325, 329 n.1 (4th Cir. 2014). No Tenth Circuit decision appears to have considered the issue, but the Third Circuit has suggested that courts should consider the "symptoms and severity of the impairment, the type of treatment required, the risk involved, and whether any kind of surgical intervention is anticipated or necessary." *Eshelman*, 961 F.3d at 249; *Budhun v. Reading Hosp. & Med. Ctr.*, 765 F.3d 245, 259–60 (3d Cir. 2014) (finding broken bone in plaintiff's hand was both transitory and minor).

---

[6] Lanzrath also implies, without support, that age was part of his disability. Doc. 36 at 20 (arguing PTC regarded him as impaired, "especially in conjunction with his age"). Advanced age is not an impairment. *See* 29 C.F.R. § 1630.2(h) app. (2000); *see also* Keith R. Fentonmiller & Herbert Semmel, *Where Age and Disability Discrimination Intersect: An Overview of the ADA for the ADEA Practitioner*, 10 Geo Mason U. Civ. Rts. L.J. 227, 238 (2000). Lanzrath fails to cite any authority suggesting otherwise.

Lanzrath's shoulder injury will not support a regarded-as claim because it was both transitory and minor. Lanzrath concedes that his shoulder injury was transitory. Doc. 36 at 20. The record supports that concession. He first notified PTC that he suffered a shoulder injury on October 31, 2019. He took a short time off work but experienced no pain or other issues with it after his December 2, 2019, epidural shot. He then submitted a full release from his physician on December 27, 2019. Thus, just over two months after the injury first manifested, Lanzrath's shoulder had healed, and he went back to work as normal.

He argues, however, that the shoulder injury was not minor because it resulted in "extreme pain." Doc. 36 at 20. That will not do. As the record shows, a little more than a month after the injury, he received an epidural shot and testified that he had no further issues. He returned to work without restrictions around January 8, 2020. He had no lingering issues and needed no significant treatment or surgical intervention. His situation is comparable to others found to be minor. *See e.g.*, *Budhun*, 765 F.3d at 260 (broken finger expected to heal within two months); *Clark v. Boyd Tunica, Inc.*, No. 14-0204, 2016 WL 853529, at *4 (N.D. Miss. Mar. 1, 2016) (broken foot); *Bush v. Donahoe*, 964 F. Supp. 2d 401, 422–23 (W.D. Pa. 2013) (sprained ankle/foot). Thus, Lanzrath's ADA claims fail as a matter of law because the injury he identifies was "transitory and minor."

### III

For the foregoing reasons, PTC's Motion for Summary Judgment, Doc. 33, is GRANTED in part and DENIED in part.

It is so ordered.

Date: March 14, 2022              s/ Toby Crouse
                                  Toby Crouse
                                  United States District Judge